*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

PAUL DEMARCO,

       Plaintiff,

v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

       Defendant.

Civil Action No. 21-16153 (FLW)

**OPINION**

**WOLFSON, Chief Judge:**

Paul Demarco ("Plaintiff") appeals from the final decision of the Acting Commissioner of Social Security, Kilolo Kijakazi ("Defendant"), denying Plaintiff's application for disability under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record ("A.R."), the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence, and accordingly, the ALJ's decision is **AFFIRMED**.

## I.   FACTUAL AND PROCEDURAL HISTORY

Plaintiff, born on May 26, 1955, was 62 years old on his alleged disability onset date of November 30, 2017. (A.R. 15, 40.) On August 6, 2018, Plaintiff, represented by counsel, filed a Title II application for a period of disability and disability insurance benefits, alleging disability due to osteoarthritis of the right knee, hypertension, asthma, and right shoulder pain. (A.R. 69.) The application was denied initially on October 18, 2018, and upon reconsideration on March 27, 2019. (A.R. 15.) Plaintiff then filed a written request for a hearing before an ALJ, which was held via telephone on January 8, 2021. (A.R. 38.) On January 20, 2021, the ALJ determined

1

that Plaintiff was not disabled at any time from Plaintiff's alleged disability onset date through the date of decision. (A.R. 31.)  Following the ALJ's decision, Plaintiff sought review by the Appeals Council, which was denied on June 28, 2021.  (A.R. 1–6, 183–85.)  Plaintiff now appeals the ALJ's decision under 42 U.S.C. § 405(g).

### A.  Review of Medical Evidence

#### i.  Medical Records

Plaintiff has a history of right knee traumatic chondropathy, dating back to 2008, for which he was conservatively treated by Dr. Toby B. Husserl at the Orthopaedic Institute of Central Jersey.  (A.R. 321.)  Plaintiff's 2016 records noted that a previous MRI had revealed a lateral meniscus tear, and in 2017, x-rays indicated narrowing of the lateral compartment.  (A.R. 322, 328.)  In 2017 and 2018, Dr. Husserl treated Plaintiff with aspiration and visco-supplementation of the right knee.  (A.R. 319–20, 476–77.)  By late 2018, Plaintiff was wearing a knee brace with good range of motion and continued with visco-supplementation as recommended by Dr. Husserl. (A.R. 322, 1078.)  Plaintiff also sought treatment for his right ankle in 2018, reporting chronic ankle pain, including a flare as a result of twisting the ankle.  (A.R. 455.)  Dr. John A. Petrillo of Ocean Orthopedic Associates prescribed an ankle brace for Plaintiff and diagnosed him with arthritis.  (A.R. 455.)  After continued discomfort, Plaintiff underwent a cortisone injection in November 2018, at a follow-up visit with Dr. Petrillo.  (A.R. 454.)  Plaintiff sought further orthopedic care for his ankle pain in February 2020 with Dr. Petrillo, and an MRI revealed soft tissue swelling and cartilage erosion.  (A.R. 1165.)  He was prescribed a foot orthotic and instructed to continue using the ankle brace.  (*Id.*)

Plaintiff was treated for asthma and hypertension on an outpatient basis in 2017 and 2018.  (A.R. 331–62, 390–410.)  In October 2017, Plaintiff was assessed by Dr. Michael Viksman

at The Allergy & Asthma Group, and at that time, his FEV1 airflow value was 84% of predicted. (A.R. 339.)  In December 2017, while Plaintiff's FEV1 airflow value was 95% of predicted, Dr. Viksman noted a possible early obstructive pulmonary impairment, suggested by other reduced airflow markers. (A.R. 336.)  Dr. Viksman's treatment notes indicate that Plaintiff is prescribed an inhaler for asthma. (A.R. 333.)  Plaintiff's cardiology examinations from the same period were normal, noting only a diagnosis for benign essential hypertension. (A.R. 394.)

On January 30, 2019, Plaintiff was admitted to the emergency department at Capital Health Regional Medical Center after falling about five feet off a bi-level porch onto his back and hitting his head.  (A.R. 1059.)  A CT scan of the cervical spine revealed no evidence of an acute fracture or dislocation, but the report noted disc space narrowing and endplate degeneration.  (A.R. 1072.)  Plaintiff was diagnosed with a concussion without loss of consciousness and discharged the same day.  (A.R. 1067.) At a follow-up visit, Plaintiff denied headaches other than those immediately following the fall.  (A.R. 736.)

Plaintiff's chiropractic records from this period indicate right shoulder pain and lower back pain.  (A.R. 942.)  Following the January 2019 fall, Plaintiff reported increased soreness, which generally resolved by April 2019.  (A.R. 946.)  Plaintiff's lower back pain improved after treatment, but returned after long periods of standing or with other daily activities. (A.R. 946.) Plaintiff attended physical therapy at NovaCare Bayville from August 2019 through October 2019 for his right shoulder and cervical spine.  (A.R. 625–47.)  The physical therapy notes indicate that, in October 2019, Plaintiff was independent without difficulty in carrying, dressing, lifting, and reaching. (A.R. 646.)  An x-ray of Plaintiff's lumbar spine showed mild to moderate degenerative changes.  (A.R. 958.)  In December 2019, Plaintiff reported that he was "pretty much back to normal regarding back pain."  (A.R. 955.)

On October 17, 2020, Plaintiff was again admitted to an emergency department due to progressive neck pain on his left side.  (A.R. 968.)  Examination of Plaintiff's cervical spine indicated tenderness and a decreased range of motion.  (A.R. 968.)  An x-ray revealed no acute fractures, significant degenerative changes, or static signs of instability.  (A.R. 1019.)  Plaintiff was discharged the same day in stable condition, and he was prescribed Flexeril, Lidocaine, and Ibuprofen.  (A.R. 971, 980.)  Plaintiff attended physical therapy for his cervical spine in October and November 2020, during which he reported he was independent with difficulty.  (A.R. 1033.)  Plaintiff's 2020 medical records indicate continued use of an inhaler for uncomplicated asthma, along with normal cardiovascular and respiratory examinations.  (A.R. 1042, 1094–1105, 1124–52.)

Plaintiff's Body Mass Index ("BMI") generally fluctuated between 27 and 30 from 2017 through 2020.  Plaintiff's recorded BMI indicated slight obesity on two occasions—April 24, 2018 and February 28, 2019—when his BMI was 30.02 and 30.27, respectively. (A.R. 367, 369, 737.)

With respect to Plaintiff's mental health, Plaintiff is diagnosed with ADHD and has reported a history of difficulty concentrating.  (A.R. 492.)  Dr. Gregory Coram's treatment notes document normal mental status examinations on November 30, 2018 and January 8, 2019.  (A.R. 492–97.)  At those times, Plaintiff demonstrated normal cognition, normal thought content, normal insight, normal judgment, no memory loss, a cooperative attitude, and maintenance of typical daily activities.  (A.R. 485, 488, 493–94.)  Plaintiff's primary care records from 2017 through 2020 also indicate normal mood, behavior, thought content, and judgment.  (A.R. 1129, 1142, 1149.)

### ii.  Medical Opinion Evidence

On February 6, 2019, state medical consultant, Arden Fusman, opined that Plaintiff could perform light work with postural and environmental limitations.  (A.R. 87–88.)  In particular,

Fusman stated that Plaintiff could stand or walk for a total of four hours and sit for about six hours in the course of an eight-hour workday.  (A.R. 87.)  The postural limitations recommended by Fusman differ from the medical opinion of Plaintiff's orthopedic specialist, Dr. Husserl, who noted in November 2017, that Plaintiff could work his job as a security guard "without restrictions."  (A.R. 320.)  The only recommended limitations in Dr. Husserl's treatment notes from that time include instructing Plaintiff to ice his knee and "go easy for [a] few days" following an injection. (A.R. 320.)  In September 2019, following another knee injection, Dr. Husserl noted that Plaintiff could "get back to normal activities" the next day and could "continue to work full duty."  (A.R. 1091.)

State psychological consultant, Howard Mangel, Ph.D., also opined on February 19, 2019, that Plaintiff is "able to perform simple work like tasks with adequate attention and concentration for simple commands and recall of simple instructions."  (A.R. 85.)  Mangel further stated that with respect to Plaintiff's "mental function" his "[l]evel of impairment is clearly not severe." (*Id.*)  On January 24, 2019, Plaintiff's psychologist, Dr. Coram, completed a medical report stating that Plaintiff is limited in sustained concentration and persistence due to ADHD.  (A.R. 484–88.)

### B.  Review of Testimonial Evidence

#### i.  Plaintiff's Testimony

At outset of the hearing, Plaintiff's counsel represented that the record was complete, and the ALJ subsequently admitted Plaintiff's medical records and other exhibits.  (A.R. 41.)  Plaintiff first testified that he was born on May 26, 1955, lives in Toms River, New Jersey, and holds a college degree in history.  (A.R. 40, 42.)  Plaintiff noted that he is 5'10", weighs 195 pounds, and is left-handed.  (A.R. 42.)  Plaintiff explained that, on November 30, 2017, he informed the Social

Security Administration that he could no longer work due to his alleged disability.  (A.R. 43.) Prior to the onset of his alleged disability, Plaintiff worked as a part-time security officer at Ocean County College.  (*Id.*)  Plaintiff stated that he was carrying and lifting around 50 pounds while working as a security officer.  (*Id.*)  He also testified that during his 16-hour work week he spent about 30 percent of his time sitting and 70 percent walking or standing.  (A.R. 44.)

Plaintiff explained that, before working as a part time security guard, he worked first as an officer, and then as a sergeant, in the Ocean County Sheriff's Department for eight years. (A.R. 46.)  Plaintiff stated that as a full-time sheriff's officer, he was lifting and carrying about 50 pounds, sitting 70 percent of the time, and standing 30 percent of the time.  (A.R. 47.)  Plaintiff noted that once he was promoted to sergeant, he was still lifting and carrying about 50 pounds, sitting 50 percent of the time, and standing 50 percent of the time.  (A.R. 48.)  Plaintiff ultimately retired from his position as a sergeant for the Ocean County Sheriff's Department in 2014.  (*Id.*)

Plaintiff then testified to two orthopedic conditions affecting his right knee and right ankle.  First, Plaintiff explained that he had osteoarthritis in his right knee for about 13 years, causing him to experience pain, discomfort, swelling, and stiffness.  (A.R. 48, 49.)  He explained that this condition has resulted in decreased mobility.  (*Id.*)  Second, Plaintiff testified that he also has arthritis in his right ankle, which causes pain and had previously resulted in frequent ankle sprains, for which he was given an ankle brace.  (A.R. 49, 51.)  Plaintiff stated that he had not been told by any doctor to cease working.  (A.R. 45.)

### ii.  Vocational Expert's Testimony

The Vocational Expert, Warren Maxim ("VE"), first classified Plaintiff's past work as a security guard, which has a DOT number of 372.667-034, and is performed at a light exertion level with a specific vocation preparation (SVP") of 3.  (A.R. 54.)  Because Plaintiff testified

that he would sometimes lift or carry 50 pounds as security guard, the VE noted that Plaintiff

performed the job at a medium exertion level.  (*Id.*)  The VE next classified Plaintiff's past work

as a sheriff's officer and sergeant, which equate to DOT number 377.137-018, and are also

performed at a medium exertion level.  (A.R. 55.)

The ALJ then asked the VE the following hypothetical:

> [A]ssume a hypothetical individual of the same age, education and
> work experience as the claimant with the residual functional
> capacity to perform medium work as defined by the Dictionary of
> Occupational Titles, never climbing ladders, ropes or scaffolds,
> occasionally climbing ramps and stairs, balancing, stooping,
> kneeling and crouching, never crawling, frequently reaching in all
> directions with the right upper extremity, no constant operation of
> foot controls with the right lower extremity, avoiding concentrated
> exposure to extreme temperatures, wetness, humidity, dust, fumes,
> odors, gases or pulmonary irritants, unprotected heights and
> moving mechanical parts.
>
> Could such a hypothetical individual perform the claimant's past
> work as performed or as generally performed in the national
> economy given those limitations?

(A.R. 56.)  The VE replied that the limitations "would not allow the work in either position as

performed," but "would allow work in those positions as described by the DOT."  (*Id.*)  The VE

further noted that there are other positions that exist in significant numbers in the national

economy at the light exertion level, but not at the medium exertion level.  (*Id.*)

The ALJ next asked a second hypothetical:

> [A]ssume a hypothetical individual of the same age, education and
> work experience as the claimant with the residual functional
> capacity to perform medium work as defined by the Dictionary of
> Occupational Titles, never climbing ladders, ropes or scaffolds or
> crawling, frequently climbing ramps and stairs, balancing,
> stooping, kneeling and crouching, frequently reaching in all
> directions with the right upper extremity which is the non-dominant
> extremity, no constant operation of foot controls with the right
> lower extremity, avoiding concentrated exposure to extreme
> temperatures, wetness, humidity, pulmonary irritants, dust, fumes,

odors, gases, unprotected heights and moving mechanical parts.

Could such a hypothetical individual perform the claimant's past work as performed or as generally performed in the national economy given those limitations?

(A.R. 57.)  The VE replied that such limitations "would allow past work both as described by the DOT and as performed."  (*Id.*)  The VE also stated that other jobs in the national economy that could be performed by the hypothetical individual given the limitations include: (1) bagger, which has a DOT number of 920.687-014 and is performed at a medium exertion level with an SVP of 2; (2) salvage laborer, which has a DOT number of 929.687-022 and is performed at a medium exertion level with an SVP of 2; and (3) stores laborer, which has a DOT number of 922.687-048 and is performed at a medium exertion level with an SVP of 2.  (A.R. 58.)

In response to a third hypothetical involving light work with the same limitations as the first hypothetical individual, the VE explained that such limitations would "allow past work as described by the DOT but certainly not as performed." (A.R. 59.)  The VE noted that other jobs in the national economy for such an individual include: (1) mail clerk, which has a DOT number of 209.687-026 and is performed at the light exertion level with an SVP of 2; (2) retail marker, which has a DOT number of 209.587-034 and is performed at the light exertion level with an SVP of 2; and (3) photocopy machine operator, which has a DOT number of 207.685-014 and is performed at a light exertion level with an SVP of 2.  (*Id.*)  In response to a fourth hypothetical involving sedentary work with the same limitations as the second hypothetical individual, the VE explained that past work would not be possible.  (A.R. 60.)  The VE separately explained that the tolerance level for off task behavior is generally 15 percent, or nine minutes per hour, and that a day and half to two days absence per month is considered excessive.  (A.R. 60.)

Finally, the VE responded to brief questioning by Plaintiff's counsel.  Asked to assume that

a hypothetical individual is unable to stand and walk more than four hours in an eight-hour workday, the VE stated that such a limitation would not allow for successful past work as described by the DOT.  (A.R. 60.)  Additionally, the VE explained that such a limitation would significantly erode the occupational options requiring light exertion and would not allow for any work at the medium exertion level.  (A.R. 61.)

### C.  ALJ Decision

On January 20, 2021, the ALJ issued a written decision analyzing whether Plaintiff satisfied his burden to demonstrate disability using the standard five-step process.  (A.R. 15–37.)  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the onset of his alleged disability.  (A.R. 17.)  At step two, the ALJ found that the Plaintiff had the following severe impairments: asthma, degenerative disc disease (cervical and lumbar), obesity, osteoarthritis, and degenerative joint disease of the right knee and right ankle.  (*Id.*)  At step three, the ALJ determined that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the relevant CFR.  (A.R. 22.)  In so deciding, the ALJ "gave special consideration" to listings 1.02, 1.04, and 3.03.  (*Id.*)

The ALJ then determined that Plaintiff had a residual functional capacity ("RFC") to perform medium work, except Plaintiff can never climb ladders, ropes, or scaffolds or crawl.  (A.R. 23.)  Plaintiff can frequently climb ramps or stairs, balance, stoop, kneel, crouch, and reach in all directions with his right upper extremity.  (*Id.*)  But Plaintiff cannot constantly operate foot controls with his right lower extremity and should avoid concentrated exposure to extreme temperatures, wetness, humidity, pulmonary irritants, dust, fumes, odors, gases, unprotected heights, and moving mechanical parts.  (A.R. 23.)

At step four, the ALJ found that Plaintiff is capable of performing past relevant work as a security guard and as a court deputy.  (A.R. 29.)  At step five, considering Plaintiff's age, education, work experience, and RFC, the ALJ also determined that Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  (A.R. 31.)

## II.    <u>STANDARD OF REVIEW</u>

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential.  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).   Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance.  *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).  "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotations and citations omitted). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993).  Accordingly, even if there is contrary evidence in the record that would

justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." *Id.* § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* § 1382c(a)(3)(A)- (B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* § 404.1520(a)(4)(i); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See id.* § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. *Id.* § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." *Id.* § 404.1522(b). These activities include

physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id*. § 404.1522(b)(1). A claimant who does not have a severe impairment is not considered disabled. *Id*. at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). *Id*. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id*. § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See id*. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id*. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186. If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141.

If the claimant can perform past relevant work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five,

that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428.  This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience.  20 C.F.R. § 404.1520(a)(4)(v).  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant can perform work and not disabled.  *Id.*

### III.    PLAINTIFF'S CLAIMS ON APPEAL

Plaintiff contests the decision of the ALJ on two grounds.  First, Plaintiff argues that the ALJ did not meaningfully consider his obesity in combination with his other impairments throughout the five-step sequential analysis.  Pl. Br. at 10–24.  Second, Plaintiff asserts that the RFC is not based on substantial evidence, because it does not properly consider his obesity or any of the six documented impairments that the ALJ determined were "not severe."  Pl. Br. at 24–35.  The Court addresses each basis in turn.

### A. The ALJ's Consideration of Plaintiff's Obesity.

Plaintiff asserts that the ALJ, having found Plaintiff's obesity to be a severe impairment at step two, was under the obligation, pursuant to SSR 19-2p, to consider obesity in combination with Plaintiff's other impairments at each of the subsequent steps of the sequential analysis, but ultimately failed to do so.  Pl. Br. at 15.  Plaintiff emphasizes that the ALJ discussed his obesity only once in her decision and argues that the discussion omits any consideration of how his obesity might affect the other documented impairments.  Pl. Br. at 15–22.  However, despite Plaintiff's objections, I find that the ALJ properly considered Plaintiff's obesity under SSR 19-2p.  (A.R. 22–23.)  But, even if the ALJ did not discuss Plaintiff's obesity at length, such an omission would amount to harmless error because, substantively, the ALJ's decision is clear that Plaintiff's obesity, alone and in combination with other impairments, did not meet or equal a

listing.   Further, Plaintiff has failed to provide any evidence as to how his obesity might exacerbate his other conditions such that his impairments would constitute a listing.

At step three, the ALJ is required to determine whether any of a claimant's impairments, alone or in combination with other impairments, meet or are medically equivalent to one of the impairments enumerated in the Impairments List.  The Commissioner removed obesity from the Impairments List in 2000 by rescinding Paragraph 9.09, but "this did not eliminate obesity as a cause of disability."  *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 503 (3d Cir. 2009).  Since then, the Commissioner has promulgated a series of SSRs, which instruct how to consider obesity under the listings.  *See Diaz*, 577 F.3d at 503; *Paladino v. Saul*, No. 18-15459, 2020 WL 525864, at *5–6 (D.N.J. Jan 31, 2020); Def. Br. at 5 n.4.  The most recent iteration of this guidance, SSR 19-2p, which rescinds and replaces SSR 02-01p, provides, in part:

> Obesity is not a listed impairment; however, the functional limitations caused by the MDI of obesity, alone or in combination with another impairment(s), may medically equal a listing. For example, obesity may increase the severity of a coexisting or related impairment(s) to the extent that the combination of impairments medically equals a listing.
>
> We will not make general assumptions about the severity or functional effects of obesity combined with another impairment(s). Obesity in combination with another impairment(s) may or may not increase the severity or functional limitations of the other impairment. We evaluate each case based on the information in the case record.

SSR 19-2p, 2019 WL 2374244, at *4 (May 20, 2019).  Thus, under SSR 19-2p, "an ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step."  *Diaz*, 577 F.3d at 504.

The ALJ must also clearly set forth the reasons for her decision.  *Burnett v. Comm'r of*

*Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).  "Conclusory statements that a condition does not constitute the medical equivalent of a listed impairment are insufficient." *Diaz*, 577 F.3d at 504.  Rather, the ALJ "must provide a 'discussion of the evidence' and an 'explanation of reasoning'" in order to enable meaningful judicial review. *Id.* (quoting *Burnett*, 220 F.3d at 120). That said, the ALJ is not required "to use particular language or adhere to a particular format" in rendering her analysis and decision. *Id.* (quoting *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)).

Here, the ALJ identified Plaintiff's obesity as a severe impairment at step two and proceeded to explain, at step three, that his obesity, alone or in combination with other impairments, did not amount to a listing or limit Plaintiff's functional capacity.  Specifically, the ALJ stated:

> At times relevant to this decision, the claimant has been slightly obese. (See for example, Ex. 5F at 5 (showing a Body Mass Index ("BMI") of 30.02); Ex. 23F at 5 (showing a BMI of 30.27). The undersigned has earlier found the claimant's obesity to be severe, but the signs, symptoms and laboratory findings of his obesity are not of such severity as found in any listing. The undersigned has considered Social Security Ruling 19-2p, which instructs adjudicators to consider the effects of obesity not only under the listings, but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity. When obesity is identified as a medically determinable impairment, consideration will be given to any functional limitations resulting from the obesity in the residual functional capacity assessment in addition to any limitation resulting from any other physical or mental impairment identified. As indicated in SSR 19-2p, obesity may have an adverse impact upon co-existing impairments. These considerations have been taken into account in reaching the conclusions herein. The undersigned has considered the claimant's obesity in combination with his other impairments and assigned a medium exertional level with additional limitations.

(A.R. 22–23.)  Read in conjunction with the rest of the ALJ's decision, this discussion of

Plaintiff's obesity is sufficient for judicial review.  The ALJ expressly acknowledges the analytical obligations imposed by SSR 19-2p and states that she considered obesity's "impact upon coexisting impairments" in reaching her conclusions, including her assignment of "a medium exertional level with additional limitations."  (A.R. 22–23.)  Elsewhere in the decision, the ALJ considered several of Plaintiff's impairments—hypertension, ADHD, anxiety disorder, gastroesophageal reflux disease ("GERD"), degenerative joint disease of the right shoulder, left elbow bursitis, and concussion recovery—and found them to be "nonsevere when considered singularly or in combination with other impairments," including obesity. (A.R. 18, 22–23.)  Similarly, the ALJ discussed Plaintiff's other severe impairments in addition to obesity—asthma, degenerative disc disease (cervical and lumbar), osteoarthritis, and degenerative joint disease of the right knee and right ankle.  (A.R. 17, 22–29.)  The ALJ's decision as whole, thus, provides the requisite analysis of Plaintiff's collective impairments, including his obesity and its impact.

Plaintiff's reliance upon *Diaz* for the proposition that the ALJ was required to provide additional analysis with respect to the effects of Plaintiff's obesity is misplaced.  Pl. Br. at 23.  In *Diaz*, the ALJ acknowledged the claimant's obesity as a severe impairment at step two, "but failed to consider its impact, in combination with her impairments, at step three, as required."  577 F.3d at 503.  In ruling that the ALJ did not sufficiently consider Plaintiff's obesity at step three, the Third Circuit emphasized that the ALJ's decision did not include "any discussion of the combined effect" of the claimant's "obesity and other impairments on her functional capabilities."  *Id.* at 504.  In contrast, the ALJ here expressly considered the guidance of SSR 19-2p and explained that Plaintiff's obesity in combination with other impairments did not amount to a listing, and did not affect Plaintiff's ability to work at a medium exertion level.  (A.R. 22–23.)  For similar reasons, Plaintiff's citation to this Court's decision in *Paladino v. Saul*, No. 18-15459, 2020 WL

525864 (D.N.J. Jan. 31, 2020) is also unavailing.  Pl. Br. at 24 n.10.  In *Paladino*, the ALJ "failed to mention [the claimant's obesity] at all at step three."  2020 WL 525864, at *6.  This omission amounted to clear error as the record was ambiguous as to whether the claimant's obesity, in combination with the claimant's other impairments, constituted, or was the medical equivalent, of a listing.  *Id.*  Not so here—the record is unambiguous on this point.  The ALJ expressly stated at step three that the cumulative effects of Plaintiff's obesity do not rise to the level of a listing or the medical equivalent, and stated that such analysis factored into her determination of a medium exertion level at step four.  (A.R. 22–23.)  Indeed, "[t]his analysis comports with the policy set forth in Social Security Ruling (SSR) [19-2p]."  *Santini v. Comm'r of Soc. Sec.*, 413 F. App'x 517, 520 (3d Cir. 2011).

Regardless, even if the Court found Plaintiff's obesity required further discussion by the ALJ under SSR 19-2p, the omission of an additional explanation would amount to harmless error on the present record.  In seeking reversal or remand, Plaintiff bears the burden of demonstrating that the ALJ has committed harmful error.  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009); *Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016).  But Plaintiff has failed "to provide any explanation as to how further consideration of [his] obesity would have changed [the ALJ's] determination that []he was entitled to benefits."  *Mercado v. Comm'r of Soc. Sec.*, No. 18-17422, 2020 WL 7768388, at *4 (D.N.J. Dec. 30, 2020) (finding claimant failed to prove harmful error).  Indeed, the record evidence provides no indication that additional analysis of Plaintiff's obesity would have had any material effect on the ALJ's decision.   First, the ALJ found that Plaintiff was "slightly obese" based on two BMI readings from April 2018 and February 2019, where Plaintiff's BMI marginally crossed the threshold that indicates low-risk obesity.  (A.R. 22, 367, 369, 737.)  Plaintiff does not dispute this finding.  Importantly, all other

BMI readings in the record fall below the obesity threshold. Def. Br. at 10. Second, tellingly, Plaintiff did not indicate obesity as an issue on his application for disability benefits in August 2018 (A.R. 69.), nor did he qualify as obese at that time, or at the time of his testimony at the January 8, 2021 administrative hearing. Def. Br. at 11. Notably, the administrative record does not even indicate an obesity diagnosis by a medical professional. *Cf. Diaz*, 577 F.3d at 502 (noting claimant had been "diagnosed as morbidly obese"); *Paladino*, 2020 WL 525864, at *1 (noting claimant's history of obesity and that her BMI had reached as high as 47.04). Without more, Plaintiff's objection to the thoroughness of the ALJ's discussion of his slight obesity does not warrant reversal or remand.

### B. The RFC Is Supported By Substantial Evidence

Plaintiff next argues that the RFC is not supported by substantial evidence, because the ALJ failed to consider Plaintiff's obesity or any of the impairments deemed non-severe in assigning a medium exertion level and the capability to perform past relevant work. Pl. Br. at 24–35. Specifically, as to Plaintiff's physical limitations, Plaintiff asserts that the ALJ never explains how he could perform medium exertion level work given the combination of his severe and non-severe impairments without further postural and activity restrictions. Pl. Br. 30–34. With respect to the mental capabilities implicit in the RFC and required by his past work, Plaintiff contends that the ALJ ignored his diagnoses of ADHD and anxiety disorder and that his past relevant work involved skilled labor. Pl. Br. at 29–30. I find that the ALJ's RFC determination is supported by substantial evidence.

"[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see* 20 C.F.R. § 404.1545(a). In determining RFC, "[t]he ALJ

must consider all the evidence and give some reason for discounting the evidence she rejects." *Plummer*, 186 F.3d at 429.  "Where the ALJ's findings of fact are supported by substantial evidence, [courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently."  *Hagan v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012) (internal quotation marks and citation omitted).

Here, the ALJ provided sufficient rationale for her RFC determination by properly considering Plaintiff's severe and non-severe physical and mental impairments in assigning a medium exertion level.  In light of the record evidence, the ALJ concluded that Plaintiff "had relatively benign examination findings when considering his allegations of disability," with only "brief periods of exacerbation." (A.R. 27.)  Regarding Plaintiff's severe physical impairments, the ALJ noted that Plaintiff's asthma was controlled, that he frequently denied chest pain, shortness of breath, or wheezing, and that he was treated with medication only on an outpatient basis.  (A.R. 24, 27–28.)  In December 2017, Plaintiff's FEV1 airflow value was 95% of predicted, and 2017 and 2018 treatment notes indicated unremarkable cardiovascular and respiratory examinations. (A.R. 27.) The ALJ addressed Plaintiff's degenerative joint disease of the right knee and ankle, which were both treated conservatively over the relevant time period. (A.R. 24–27.)  In October 2018, an examination of Plaintiff's right knee showed neutral alignment, no gross effusion or tenderness, and no material changes in x-ray findings when compared to those of 2017.  (A.R. 27, 480.)  Treatment notes with respect to Plaintiff's right ankle indicated only minimal swelling and tenderness.  (A.R. 27, 455.)  The ALJ also analyzed Plaintiff's history of degenerative disc disease, which was characterized in his medical records as mild to moderate and responded to medication, physical therapy, and chiropractic treatments. (A.R. 25–27.)  April 2019 chiropractic records indicated that Plaintiff's pain from his fall earlier

in the year had largely resolved, and a November 2019 x-ray of Plaintiff's lumbar spine showed only mild to moderate degenerative changes, without evidence of fracture or dislocation.  (A.R. 28, 946, 958.)  Finally, as noted *supra*, the ALJ's review of Plaintiff's medical records did not indicate any complications as a result of his slight obesity.  (A.R. 22–23.)

Regarding Plaintiff's non-severe physical impairments—hypertension, GERD, degenerative joint disease of the right shoulder, left elbow bursitis, and the 2019 concussion—the ALJ described each in detail, discussing the relevant medical records and her rationale as to why each impairment was non-severe.  (A.R. 18–19.)  The ALJ noted that Plaintiff's medical records showed his hypertension was "manageable and came under control with medication adjustments." (A.R. 18.)  Similarly, the ALJ stated that Plaintiff's GERD appeared "largely controlled with medication."  (*Id.*)  Over the relevant time period, Plaintiff's right shoulder was treated conservatively with physical therapy, and treatment notes indicate Plaintiff retained near full range of motion and shoulder strength.  (*Id.*)  In 2020, Plaintiff experienced non-tender swelling of his elbow which was treated with aspiration and injection—Plaintiff retained normal range of motion and elbow strength. (A.R. 19.)  The ALJ also addressed Plaintiff's recovery from a concussion as a result of the January 2019 fall, noting that "[t]he overall evidence suggests that the concussive symptoms resolved within less than 12 months, and there is no evidence of lasting functional loss from this impairment."  (*Id.*)  Concluding this analysis, the ALJ expressly stated that she "considered all of the claimant's medically determinable impairments, including those that are not severe, when assessing the residual functional capacity."  (A.R. 19.)

The ALJ also devoted a lengthy discussion to Plaintiff's non-severe mental impairments and found that Plaintiff's "medically determinable mental impairments of ADHD and anxiety disorder do not cause more than minimal limitation in the claimant's ability to perform basic

mental work activities." (A.R. 19.) Notably, the ALJ found no limitation as to each of the four Paragraph B criteria: understanding, remembering, or applying information; interaction with others; concentration, persistence, or pace; and adapting or managing oneself. (A.R. 20–22.) And the ALJ further stated that her "residual functional capacity assessment reflects the degree of limitation" found in the Paragraph B analysis. (A.R. 21.)

Plaintiff argues that medium exertion work is not appropriate given his age and the combination of his severe and non-severe impairments, and that the ALJ ignored contrary medical opinion evidence in making her RFC determination. Pl. Br. at 29–34. However, as noted, the ALJ's opinion thoroughly addressed all of Plaintiff's impairments and factored each into the RFC. Moreover, the ALJ addressed the relevant medical opinion evidence in her decision, providing sufficient reasoning for rejecting those opinions which she determined were unpersuasive.

Indeed, the ALJ "is free to choose the medical opinion of one doctor over that of another," and "[w]hen a conflict in the evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason." *Diaz*, 577 F.3d at 505. Here, the ALJ considered and rejected the opinion of state psychological consultant, Howard Mangel, Ph.D., who opined that Plaintiff could "perform simple work like tasks with adequate attention and concentration for simple commands and recall of simple instructions." (T.R. 85.) The ALJ explained that the opinion was unpersuasive because "it is inconsistent with the overall evidence, which does not support any mental limitations," as Plaintiff's "mental status examination documented by Dr. Coram was unremarkable, including normal appearance, cooperative attitude, no memory loss, and normal cognition, insight, judgment, and attention/concentration." (A.R. 21, 485, 493–94.) Additionally, the ALJ stated that "the evidence does not support that there was any limitation in his concentration while working two service jobs in law enforcement over many

years."  (A.R. 21.)

The ALJ also rejected the state medical consultant's opinion that Plaintiff could perform "light work," explaining that the opinion "is unpersuasive because it is inconsistent with the overall evidence that shows the claimant can perform work according to the assigned residual functional capacity."  (A.R. 28.)  Specifically, the ALJ cited "evidence showing range of motion of the right knee was good," "good plantar flexion and minimal swelling in the right ankle," "normal upper extremity strength, reflexes, and sensation," and "primary care records generally showing normal cardiovascular and respiratory examinations . . . except for some elevated blood pressure readings."  (*Id.*)   Further, the ALJ found that the opinion "lack[ed] support in the form of an in person examination of the claimant." (*Id.*)   Other relevant medical opinion evidence included that of Dr. Husserl, who treated Plaintiff for his degenerative joint disease and osteoarthritis in his right knee.   (A.R. 29.)  The ALJ noted that Dr. Husserl was aware of Plaintiff's job as a security guard and that he opined in November 2017, just before the alleged disability onset date, that Plaintiff could work "without restrictions."  (A.R. 29, 320.)  Even still, in September 2019, following injection treatment, Dr. Husserl opined that Plaintiff could "continue to work full duty." (A.R. 1091.); *see Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987) (noting the value of an attending physician's opinion "when the opinion reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time") (internal quotation marks omitted).

As the ALJ's decision explains, Plaintiff was capable of successfully performing medium exertion level, skilled work just prior to his alleged disability onset date and there are no material changes in Plaintiff's medical history indicating that he would have been incapable of doing so following November 30, 2017.  (A.R. 29–30.)  Given Plaintiff's RFC, the ALJ

concurred with the VE that Plaintiff was capable of fulfilling the duties of a security guard as they are generally performed and as they were actually performed by Plaintiff in the past.  (A.R. 29.)  Further, there are other jobs that exist in significant numbers in the national economy that the claimant can also perform.  (A.R. 30.)  Because the ALJ's RFC determination is based on substantial evidence, Plaintiff's request for remand is denied.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, the ALJ's decision is **AFFIRMED**.  An appropriate order shall follow.


Date:   August 10, 2022                         /s/ Freda L. Wolfson
                                                Freda L. Wolfson
                                                U.S. Chief District Judge